

JUDGE CASTEL

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff,

      vs.

JAMES E. GANSMAN, DONNA B. MURDOCH,
and GERALD L. BRODSKY,

      Defendants.

ECF CASE

COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission")

alleges:

### SUMMARY OF THE ACTION

1.     This is an insider trading case.  From at least the summer of 2006 through

the fall of 2007, a partner at a Big Four accounting firm tipped his friend concerning the

identities of at least seven different acquisition targets of clients who sought valuation

services from his firm in connection with those acquisitions.  Knowing the confidential

nature of this information, the friend used the information to trade in the securities of the

target companies, and made recommendations to others who traded as well, resulting in

total illegal trading profits of $596,000.

2.     Defendant, James E. Gansman ("Gansman"), a lawyer and a former

partner in Ernst & Young LLP's ("E&Y's") Transaction Advisory Services ("TAS")

department in New York, learned of each of the pending acquisitions, and the identity of

the target companies, through his work at E&Y advising the acquirers.  On numerous

occasions, in breach of a duty of confidentiality he owed to E&Y and the firm's clients, Gansman misappropriated the information about pending acquisitions by tipping defendant Donna B. Murdoch ("Murdoch"). Murdoch was a registered securities professional and Managing Director of a Philadelphia-based broker-dealer and investment banking firm. Gansman provided Murdoch material, nonpublic information, including information concerning the identities of target companies and the existence of acquisition talks involving those companies.

    3.    Murdoch used the material, nonpublic information Gansman provided to her, by:

    a.    trading in the securities of at least seven companies that were acquisition targets of E&Y's clients, realizing illegal profits totaling at least $392,035;

    b.    tipping her father, defendant Gerald L. Brodsky ("Brodsky"), concerning one of the pending acquisitions—that of Freescale Semiconductor, Inc. ("Freescale"); Brodsky, in turn, traded on this information through a nominee account, realizing illegal profits totaling $63,400; and

    c.    recommending trading in the securities of two of the target companies—Freescale and ATI Technologies, Inc.—to other persons, who likewise traded, for profits totaling an additional $140,760.

In all, the illegal profits flowing from Gansman's tipping of Murdoch totaled at least $596,195.

4.      At the time of all this tipping and trading, Gansman knew or recklessly disregarded, and Murdoch and Brodsky knew or were reckless in not knowing, that Gansman's tipping of Murdoch was in breach of Gansman's duties to E&Y and its clients. By their conduct, each of the defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j (b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5]. Defendants Gansman and Murdoch also violated Section 14(e) of the Exchange Act [15 U.S.C. §§ 78n(e)]  and Rule 14e-3 thereunder [17 C.F.R. §§ 240.14e-3]. Each defendant will continue to violate the foregoing statutes and rules unless restrained or enjoined by this Court.

5.      The SEC seeks permanent injunctions enjoining the defendants from further violations of the federal securities laws, disgorgement of their unlawful trading profits with prejudgment interest, civil monetary penalties, and any additional relief that the Court deems appropriate.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Exchange Act Sections 21(d), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d) and 78u(e), 78u-1, and 78aa].

7.      Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of business alleged herein.

8.      Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial portion of the conduct alleged in this complaint occurred within the bounds of the Southern District of New York.

9.    At all relevant times Gansman worked and lived in Manhattan.

10.    Murdoch frequently placed or received telephone calls or sent or received text messages to or from Gansman while he was physically located in Manhattan. During these communications, Gansman conveyed many of his unlawful tips.

11.    All of the target companies in whose securities Murdoch and Brodsky traded had their common stock listed for trading on a stock exchange headquartered in Manhattan.

## DEFENDANTS

12.    Defendant Gansman, age 48, resides in Manhattan. At all relevant times, he was a partner in E&Y's TAS department. He also was and is a lawyer licensed to practice by the Bar of the State of New York. Gansman resigned from E&Y on October 19, 2007.

13.    Defendant Murdoch, age 46, resides in Malvern, Pennsylvania. Since 2006 and continuing to the present, she has been a registered securities industry professional. Since 2006 and continuing to the present she has been a registered representative and a Managing Director of a Pennsylvania based broker-dealer and investment banking firm. She is also a founding partner of an affiliated consulting firm. According to the broker-dealer's website, Murdoch "focuses on mergers and acquisitions along with capitalization strategies for technology companies, with special emphasis on energy, emerging growth and information technology." Until recently, Murdoch carried the title of President of Glycology, Inc., a nutritional-supplement company whose securities were quoted on the Pink Sheets, under the ticker symbol GLYC.

4

14. Defendant Brodsky, age 71, resides in Narberth, Pennsylvania and is the father of defendant Murdoch. He is retired. On October 22, 1993, Brodsky pled guilty to one count of securities fraud in an unrelated matter. *See United States v. Gerald L. Brodsky*, Crim. No. 93-10 (E.D. Pa. 1993).

## THE ACQUISITION TARGETS

15. ATI Technologies Inc. ("ATI") is a Canadian corporation headquartered in Markham, Ontario, Canada, that supplies graphics and multimedia processors and technologies for desktop and notebook PCs and consumer electronic devices such as mobile phones, digital televisions and game consoles. Prior to its merger with Alberta ULC — an indirect wholly owned subsidiary of Advanced Micro Devices, Inc. ("AMD") — ATI's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act, and listed on the Nasdaq National Market System under the ticker symbol ATYT.[1]

16. Freescale is a Delaware corporation headquartered in Austin, Texas, that designs and manufactures embedded semiconductors for the automotive, consumer, industrial, networking and wireless markets. Prior to being taken private by a consortium of private equity firms effective December 31, 2006, Freescale's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and listed on the New York Stock Exchange under the ticker symbols FSL and FSL.B.

17. Portal Player, Inc. ("Portal Player") is a Delaware corporation headquartered in San Jose, California, that designs, develops and markets comprehensive semiconductor platform solutions for manufacturers of media players and notebook computers. Prior to

---

[1]    On July 31, 2006 the Nasdaq National Market changed its name to the Nasdaq Global Market. Also in 2006, Nasdaq became an exchange and companies traded on the Nasdaq Global Market became registered with the Commission pursuant to Section 12(b) of the Exchange Act.

its merger with NVIDIA Corporation, Portal Player's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and listed on the Nasdaq Global Market under the ticker symbol PLAY.

18. Spectralink Corporation ("Spectralink") is a Delaware corporation headquartered in Boulder, Colorado, that designs, manufactures and sells workplace wireless telephone systems that complement exiting telephone systems by providing mobile communications in a building or campus environment. Prior to its merger with Polycom, Inc., Spectralink's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and listed on the Nasdaq Global Market, under the ticker symbol SLNK. This merger was effected through a tender offer announced through a filing with the Commission on February 7, 2007.

19. K2, Inc. ("K2") is a Delaware corporation headquartered in Carlsbad, California, that sells a portfolio of leading-brand products in the sportswear, marine and outdoor, and apparel and footwear segments. Prior to its merger with Jarden Corporation, K2's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and listed on the New York Stock Exchange under the ticker symbol KTO.

20. Dade Behring Holdings, Inc. ("Dade Behring") is a Delaware corporation headquartered in Deerfield, Illinois, that is a leading manufacturer and distributor of diagnostic products and services to clinical laboratories. Prior to its merger with Siemens Aktiengesellschaft, Dade Behring's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and listed on the Nasdaq Global Market,

under the ticker symbol DADE. This merger was effected through a tender offer announced through a filing with the Commission on July 25, 2007.

21. Activision, Inc. ("Activision") is a Delaware corporation headquartered in Santa Monica, California, that publishes interactive entertainment software and peripheral products. Prior to its merger with Vivendi, S.A.'s unit Vivendi Games, Activision's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and listed on the Nasdaq Global Market, under the ticker symbol ATVI.

## FACTS

### I.     Gansman's Work at E&Y Made Him Privy to the Material, Non-Public Information That he Then Shared With Murdoch

22. As a partner in E&Y's TAS department, Gansman specialized in human resources. During the relevant time, he served as E&Y's engagement partner for the Human Resources Due Diligence Services (hereinafter "E&Y-HR") that the firm's TAS department provided to clients. These services included valuation of the executive compensation components of each acquisition relevant to this complaint, including in most cases an analysis of the cost—in cash and stock—of payments to executives having severance or other employment agreements triggered by a change in control, and the federal excise tax implications of those costs.

23. In a typical acquisition, due diligence would not occur until confidentiality agreements had been signed by all the parties. E&Y would also sign a confidentiality agreement when it was brought in to work on the deals by its clients. By the time the acquirer in a planned acquisition commenced the E&Y-HR engagement, the parties to the

planned transaction were generally at an advanced stage of their talks, as the analysis of golden parachute payments was usually not performed prior to that stage.

24. Gansman owed a duty to his firm and to its clients, as a partner of E&Y and as the engagement partner for E&Y-HR on each of the engagements, to refrain from tipping anyone concerning material, nonpublic information he learned in the course of his work.

25.     Gansman tipped Murdoch about each of the seven deals identified below intending that she would trade on the information. In making these tips, Gansman acted for the purpose of obtaining personal benefits, including, without limitation, reputational enhancement as a source of stock tips, gratitude for being the cause of trading profits, and the ability, through his misappropriation of information concerning the pending acquisitions and attendant breach of duty to his employer and its clients, to confer "gifts" of trading profits on his friend.

26. For her part, Murdoch, a registered securities industry professional, was familiar with the prohibitions on insider trading and tipping, as well as the highly material nature of non-public acquisition talks. In March 2006, when she joined the broker-dealer, she was given its written policies governing insider trading. By March 2007, she acknowledged to her firm that she had read and understood them. She knew, or was reckless in not knowing, that Gansman's tips to her were delivered in breach of his duty of confidentiality to his employer and its clients and that it was unlawful for her to use the information for her benefit or for the benefit of her father, supervisor, or friend.

## II.    The Unlawful Tips and Trading

### A.    ATI

27. Gansman was the E&Y-HR engagement partner in the group performing valuation services for E&Y's client AMD in connection with AMD's pending acquisition of ATI. As part of the effort to insure confidentiality, E&Y and AMD applied a code name—initially "Project Supernova" and then "Project Go Big"—to the engagement.

28. By no later than June 20, 2006, Gansman knew (i) the identity of the target company, ATI; (ii) that AMD and ATI were discussing an acquisition of the latter by the former; and (iii) that the talks were highly confidential.

29. Between June 20, 2006 – or such other earlier date by which Gansman learned the foregoing material, nonpublic information - and Murdoch's first trade in ATI securities on June 26, 2006, Gansman tipped Murdoch concerning both the existence of these highly confidential acquisition talks and the identity of the target company, ATI. Gansman tipped Murdoch either in person, by electronic mail, or during any of the at least 32 communications between Gansman and Murdoch during this period that are reflected in telephone and text-message activity records for their direct office lines and cell phones.

30. Murdoch initiated her ATI trading by purchasing call options starting on June 26, 2006. Call options are a means of acquiring the right to purchase a stock for a specific "strike" price by the date the option expires. If the strike price is not reached and the options are not sold before their expiration date, the options expire worthless. So-called "out-of-the-money" options, i.e., those that are purchased when the current stock price is below the option price, allow an investor to leverage his or her investment by acquiring a right to purchase without actually having to buy the stock. Out-of-the-money

options are much cheaper than purchasing the stock because of the risk they will expire worthless.

31. Murdoch's first ATI trade was on Monday, June 26, 2006, when she bought 15 contracts for July $17.50 call options. (Each contract can be exercised to purchase 100 shares at the strike price). The company's common stock was trading between $14.69 and $15.09 that day, making the options Murdoch purchased out-of-the-money by about $2.50, and therefore in-the-money only if ATI's stock price increased more than 16% before the options expired less than a month later. Although Murdoch sold these options on the same day she purchased them at no gain, she bought more, beginning on July 5th – when the options had just over two weeks to expiration. By July 11, she had accumulated 54 of these options contracts. They expired worthless on July 21, because the AMD-ATI talks, which were still non-public, continued without any deal being announced and without any other developments triggering a sufficient increase in ATI's share price to make the July $17.50 calls profitable.

32. On July 19, Murdoch began purchasing August $17.50 ATI calls. She accumulated these options more quickly than she had bought the July $17.50s. By July 21, the last trading day before the public announcement of the acquisition, she had acquired 93 August $17.50 contracts which would permit her to sell the options at a profit if the stock reached that price before the option expired in August.

33. On Monday, July 24, 2006, before the markets opened, ATI and AMD jointly announced that AMD subsidiary Alberta ULC would acquire all of ATI's outstanding common stock for $20.47 per share in cash and AMD stock. The announced acquisition price represented a 23.6% premium over ATI's $16.56 closing price on Friday, July 21,

2006, the previous trading day. On the day of the announcement, ATI's stock price climbed to a 52-week high of $19.69 before closing at $19.67—up $3.11 per share, or nearly 19%, from its previous trading day's close, on heavy volume.

34. Following the July 24 announcement, Murdoch sold all of her open ATI call options contracts for a profit of $12,670.

### 1.    Murdoch Recommends ATI Securities to her Supervisor

35. While in possession of material, nonpublic information about ATI that she learned from Gansman, Murdoch was in daily contact with her supervisor at the broker-dealer. These contacts were in person, on the phone and via email or text message.

36. During one or more of these contacts, Murdoch recommended ATI to him, and on Friday, June 23, 2006, he, in turn, bought or caused to be bought 1,000 shares of ATI common stock in each of his two daughters' securities accounts, for a total of 2,000 shares.

37. Murdoch recommended ATI securities to her supervisor intending that he would trade on the information, both to enhance her reputation with him and to further her career and professional reputation.

38. On July 25, 2006—the day after the public announcement—Murdoch's supervisor caused his daughters' ATI stock to be sold, realizing profits of $4,660 in one account and $4,740 in the other for total profits of $9,400.

39. In all, the illegal ATI trading profits flowing from Gansman's tipping of Murdoch totaled $22,070.

**B.    Freescale**

40. Gansman was the E&Y-HR engagement partner in the group performing valuation services for E&Y's client The Blackstone Group in connection with Blackstone's pending acquisition of Freescale. As part of the effort to insure confidentiality, E&Y and Blackstone applied a code name – "Project Firestone" – to the engagement.

41. By no later than June 23, 2006, Gansman knew (i) the identity of the target company, Freescale; (ii) that Blackstone and Freescale were discussing an acquisition of the latter by the former; and (iii) that the talks were highly confidential. Also by June 23, 2006, Gansman had received this explicit admonition from a fellow E&Y partner: "FYI – they [Blackstone] want this transaction treated superconfidential. Do not breathe the name of the target outside of [the] team, and please [so] advise all others who assist you."

42. Between June 23, 2006 – or such other earlier date by which Gansman learned the foregoing material, nonpublic information - and Murdoch's first trade in Freescale securities on July 18, 2006, Gansman tipped Murdoch concerning both the existence of these highly confidential acquisition talks, and the identity of their target company, Freescale. Gansman tipped Murdoch either in person, by electronic mail, or during any of the at least 400 communications between Gansman and Murdoch during this period that are reflected in telephone and text-message activity records for their direct office lines and cell phones.

43. Murdoch's first Freescale trade was on July 18, 2006, when she bought 50 contracts for August $30 call options. The next day she bought 20 more contracts of the same series. The company's common stock was trading between $26.09 and $27.89 at

the time, rendering these options out-of-the-money by as much as $4, with just one month

remaining until their August 18 expiration. The Freescale talks continued throughout

August, and no acquisition announcement was issued before these options expired.

44. Unlike some of her early options positions in ATI—which expired

unexercised—Murdoch was able, by August 10, to break even on her August options

position in Freescale, despite the absence of any acquisition announcement, by selling

them prior to the expiration date.

45. Between her August 10 sales and August 30, when Murdoch resumed buying

Freescale options, she exchanged at least 221 telephone calls and text messages with

Gansman. Then, between August 30 and September 7, Murdoch accumulated 610

Freescale September $35 call option contracts. Freescale's common stock was trading

between $30.01 and $31.62 at the time, rendering these options out-of-the-money by as

much as $5, when they were set to expire less than three weeks later. During this period

of time, Murdoch also purchased 50 Freescale October $30 call options contracts.

46. On Friday, September 8, the last trading day before September 11, when news

of the acquisition talks became public, Murdoch sold her 50 October $30 Freescale call

contracts and used the proceeds to purchase 80 Freescale September $30 contracts. Her

trading in the September $30s that day accounted for 100% of that series' customer

trading volume.

47. On Monday, September 11, 2006, *The New York Times* reported that Freescale

was in talks to be purchased by a consortium of investment firms for $16 billion.

Freescale issued a statement that morning confirming that it was "in discussions with

parties relating to a possible business transaction" but declined to release further details.

Freescale's stock price climbed to a 52-week high of $37.18 that day, before closing at $37.06, up 20.5 percent from its previous trading day's close of $30.75 on heavy volume. Four days later, Freescale announced that it had entered into a definitive agreement to be acquired by a private equity consortium—led by Gansman's client Blackstone, and including The Carlyle Group, Permira Funds, and Texas Pacific Group—at $40 per share. Freescale's price climbed about $2 more per share—to over $39—on this news.

48. Following the September 11 announcement, Murdoch sold all of her open Freescale call options for profits of $158,970.

### 1. Murdoch Tips Brodsky and Recommends Freescale to her Supervisor and a Friend

49. Murdoch tipped her father, defendant Brodsky, that Freescale was in acquisition talks; and Brodsky used this material, non-public information in buying Freescale call options. Murdoch also recommended Freescale to her supervisor and to a friend, who likewise traded in Freescale securities. Collectively, Brodsky, the supervisor, and the friend realized profits totaling $194,760.

50. While in possession of material, nonpublic information about Freescale that she learned from Gansman, Murdoch was in communication with Brodsky and tipped him. Murdoch intended for Brodsky to trade on the information about Freescale and even instructed Brodsky on which options strategy to pursue in order to profit from the nonpublic information. In making this tip, Murdoch acted for the purpose of obtaining personal benefits, including, without limitation, reputational enhancement as a source of a stock tip, gratitude for being the cause of trading profits, and the ability to confer a "gift" of trading profits on her father.

51. On August 28, 2006, shortly after receiving Murdoch's tip, Brodsky bought 370 September $35 call options using a *de facto* nominee account held in the name of a longtime friend and business partner. Together, Murdoch's and Brodsky's trading in the September $35 calls comprised over 97% of that series' customer and firm trading volume between August 28 and September 7, 2006.

52. On September 11th, following the public announcement, Brodsky instructed his nominee to sell all the options, generating profits totaling $63,400, which were ultimately delivered to Brodsky.

53. While in possession of material, nonpublic information about Freescale that she learned from Gansman, Murdoch was in daily contact with her supervisor at the broker-dealer. These contacts were in person, on the phone and via email or text message. During one or more daily personal or electronic contacts, Murdoch recommended Freescale to her supervisor, who then bought or caused to be bought 2,000 shares of Freescale common stock in each of his two daughters' accounts. These trades were placed on July 18, 2006 – the day of Murdoch's first Freescale trade.

54. Following the public announcement, Murdoch's supervisor caused his daughters' Freescale stock to be sold, realizing profits of $22,700 in one account and $23,120 in the other, for a total of $45,820.

55. While in possession of material, nonpublic information about Freescale that she learned from Gansman, Murdoch recommended Freescale securities to a long time family friend and potential business client.

56. Murdoch recommended Freescale securities to her friend and potential client intending that he would trade on the information. She did so in furtherance of her personal

15

relationship with him, to enhance her professional reputation with him, and to potentially gain his business as a client for her firm.

57. On August 17, 2006, this friend and potential client placed three telephone calls to Murdoch. On that day, he began acquiring Freescale common stock and options. He continued to acquire Freescale common stock and options until the Friday before the announcement, September 8, 2006. By that time, he had acquired 4,000 shares of Freescale common stock and 80 call options of varying expirations and strike prices, spending a total of $140,010 in three weeks.

58. Following the public announcement about the Freescale acquisition, Murdoch's friend liquidated his Freescale positions, realizing total profits of $85,540.

59. In all, the illegal Freescale trading profits flowing from Gansman's tipping of Murdoch totaled $353,730.

### C.    Portal Player

60. Gansman was the E&Y-HR engagement partner in the group performing valuation services for E&Y's client NVIDIA in connection with NVIDIA's pending acquisition of Portal Player. As part of the effort to insure confidentiality, E&Y and Blackstone applied a code name – "Project Partridge" – to the engagement.

61. By no later than October 20, 2006, Gansman knew (i) the identity of the target company, Portal Player; (ii) that NVIDIA and Portal Player were discussing an acquisition of the latter by the former; and (iii) that the talks were highly confidential. By at least October 26, 2006, Gansman also knew that NVIDIA anticipated a definitive merger agreement by November 6.

62. Between October 26, 2006 – or such other earlier date by which Gansman learned the foregoing material, nonpublic information - and Murdoch's first trade in Portal Player securities on October 30, 2006, Gansman tipped Murdoch concerning the existence of these confidential acquisition talks and the identity of the target company, Portal Player. Gansman tipped Murdoch either in person, by electronic mail, or during any of the at least 50 communications between Gansman and Murdoch during this period that are reflected in telephone and text-message activity records for their direct office lines and cell phones.

63. Murdoch's first Portal Player trade was on October 30, 2006, when she bought 500 contracts for November $12.50 call options. Portal Player's common stock closed at $11.21 on the date of Murdoch's purchase, rendering these options out-of-the-money. Murdoch's trading in the November $12.50s that day accounted for 100% of that series' customer trading volume.

64. The next day, October 31, Murdoch bought an additional 28 Portal Player November $12.50 call option contracts.

65. On November 1, 2006, Portal Player's stock price rose past Murdoch's strike price of $12.50 when rumors about a possible acquisition surfaced. On the same day as the options became in-the-money – days after she first purchased the securities - Murdoch sold all of her open Portal Player call options contracts for a profit of $16,375.

66. On Monday, November 6, 2006, before the market opened, NVIDIA and Portal Player announced that NVIDIA had agreed to acquire Portal Player for $13.50 per share. This price reflected a premium of just 1.1% over Portal Player's closing price of $13.35 per share on Friday, November 3, 2006, the previous trading day, as rumors caused the price to rise prior to the announcement. However, the acquisition price was a

19% premium over the company's average share price for the 20-day period ended November 3, 2006. Following the announcement, shares of Portal Player reached an intra-day high of $13.50 before closing at $13.34 on heavy volume.

### D.    Spectralink

67. By at least late December 2006, Polycom had taken substantial steps towards making a tender offer for Spectralink. On December 13, 2006, Spectralink and Polycom agreed to move forward with an all-cash tender offer for Spectralink. The companies had been in negotiations since August, operating under a confidentiality agreement executed on August 8, 2006. Due diligence took place from mid-December 2006 through January 2007.

68. Gansman was the E&Y-HR engagement partner in the group performing valuation services for E&Y's client Polycom. As part of the effort to ensure confidentiality, E&Y and Polycom applied a code name – "Project Spyglass" – to the engagement.

69. By no later than February 1, 2007, Gansman knew (i) the identity of the target company, Spectralink; (ii) that Spectralink and Polycom were discussing an acquisition of the latter by the former; (iii) that the talks were highly confidential; and (iv) that Polycom anticipated an acquisition price of $11.75 per share.

70. Between the late afternoon of February 1, 2007 – or such other earlier date by which Gansman learned the foregoing material, nonpublic information - and Murdoch's first trade in Spectralink securities on February 2, 2007, Gansman tipped Murdoch concerning both the existence of these highly confidential acquisition talks and the identity of the target company, Spectralink. Gansman tipped Murdoch either in person, by

electronic mail, or during any of the at least six communications between Gansman and

Murdoch during this period of time that are reflected in telephone and text-message

activity records for their direct office lines and cell phones.

71. The only day that Murdoch purchased Spectralink securities was February 2,

2007. She purchased 130 contracts for February $10 call options. The company's

common stock was trading between $8.81 and $8.97 that day, making the options

Murdoch purchased out-of-the-money. The options were to expire in two weeks.

Murdoch's trading in the February $10s that day comprised over 54% of that series'

customer and firm trading volume.

72. On Wednesday, February 7, 2007, after the markets closed, Spectralink and

Polycom, Inc. jointly announced that Polycom would acquire all of Spectralink's

outstanding common stock through a tender offer priced at $11.75 per share. The

announced acquisition price represented a 33.4% premium over Spectralink's $8.81

closing price of earlier that day. The following day, Spectralink's share price opened at

$11.66, up $2.85, or 32.3%, from its previous day's close, before climbing to an intra-day

high of $11.73 and then closing at its $11.66 opening price on heavy volume.

73. On February 8, 2007, the day after the public announcement – less than a

week after her purchase - Murdoch sold all of her open Spectralink call options contracts

for a profit of $18,850.

### E.    K2

74. Gansman was the E&Y-HR engagement partner in the group performing valuation services for E&Y's client Jarden. As part of the effort to ensure confidentiality, E&Y and Polycom applied a code name – "Project J1" – to the engagement.

75. By no later than April 17, 2007, Gansman knew (i) the identity of the target company, K2; (ii) that Jarden and K2 were discussing an acquisition of the latter by the former; (iii) that the talks were highly confidential; and (iv) that Jarden anticipated an acquisition price of $15.50 per share.

76. Between April 17, 2007 - or such other earlier date by which Gansman learned the foregoing material, nonpublic information – and Murdoch's first trade in K2 securities on April 24, 2007, Gansman tipped Murdoch concerning both the existence of these highly confidential acquisition talks, and the identity of their target company, K2. Gansman tipped Murdoch either in person, by electronic mail, or during any of the at least 120 communications between Gansman and Murdoch during this period that are reflected in telephone and text-message activity records for their direct office lines and cell phones.

77. The only day that Murdoch purchased K2 securities was April 24, 2007. She purchased 150 contracts for May $12.50 call options. K2's common stock was trading between $12.52 and $12.84 per share on that day. Murdoch's trading in the May $12.50s that day comprised over 71% of that series' customer trading volume.

78. On April 25, 2007, Jarden announced that it had agreed to buy K2 in a cash and stock deal valued at $15.50 per K2 share. This price reflected a premium of 23.2% over K2's closing price of $12.58 per share on Tuesday, April 24, 2007, the previous

trading day. Following the announcement, shares of K2 rose $2.52, or 20%, to close at $15.10 on heavy volume.

79. On April 25, 2007, following the public announcement – one day after first purchasing the securities - Murdoch sold all of her open K2 call options for profits totaling $27,280.

### F.    Dade Behring

80. By at least late May, 2007, Siemens had taken substantial steps towards making a tender offer for Dade Behring. On May 22, 2007, as part of discussions concerning a possible transaction between the two companies, representatives of Dade Behring explained to Siemens that they would prefer that such a transaction take the form of an all-cash tender offer. That same day, the two companies entered into a confidentiality agreement. Between May 2007 and the end of June 2007, the two companies continued negotiations with Siemens making, and Dade Behring rejecting, offers between $68.00 and $70.00. On June 28, 2007, Dade-Behring's management presented information about its business and future growth prospects to Siemens.

81. Gansman was the E&Y-HR engagement partner in the group performing valuation services for E&Y's client Siemens, setting up its engagement billing account on June 28, 2007. As part of the effort to ensure confidentiality, E&Y and Siemens applied a code name – "Project Belfast" – to the engagement.

82. By no later than July 9, 2007, Gansman knew (i) the identity of the target company, Dade Behring; (ii) that Siemens and Dade Behring were discussing an acquisition of the latter by the former; (iii) that the talks were highly confidential; and (iv) that Siemens anticipated an acquisition price of $77 per share.

83. Between July 9, 2007 – or such other earlier date by which Gansman learned the foregoing material, nonpublic information - and Murdoch's first trade in Dade Behring securities on July 12, 2007, Gansman tipped Murdoch concerning both the existence of these highly confidential acquisition talks, and the identity of the target company, Dade Behring. Gansman tipped Murdoch either in person, by electronic mail, or during any of the at least 15 communications between Gansman and Murdoch during this period that are reflected in telephone and text-message activity records for their direct office lines and cell phones.

84. The only day that Murdoch purchased Dade Behring securities was July 12, 2007. She purchased 100 contracts for August $60 call options. The company's common stock was trading between $55.54 and $57.50 that day, making the options Murdoch purchased out-of-the-money. Murdoch's trading in the August $60s that day comprised over 73% of that series' customer trading volume.

85. On Wednesday, July 25, 2007, Dade Behring announced that it had entered into a definitive merger agreement under which Siemens would acquire all of Dade Behring's outstanding shares through a $77-per-share tender offer. This tender offer price constituted a 40% premium above Dade Behring's closing price of $54.91 on July 24, 2007, the previous trading day. Following the announcement, Dade Behring's stock price climbed $19.26—or 35%—to close at $74.17 on heavy volume.

86. Following the public announcement of July 25, 2007 - less than two weeks after first purchasing the securities - Murdoch sold all of her open Dade Behring call options contracts for a profit of $138,100.

### G.     Activision

87. Gansman was the E&Y-HR engagement partner in the group performing valuation services for E&Y's client Vivendi. As part of the effort to ensure confidentiality, E&Y and Siemens applied a code name – "Project Sego" – to the engagement. He had that position until September 27, 1007, the day that E&Y placed him on administrative leave.

88. By August 1, 2007, Gansman knew (i) the identity of the target company, Activision; (ii) that Vivendi and Activision were discussing an acquisition of the latter by the former; (iii) that the talks were highly confidential; and (iv) that Vivendi anticipated an acquisition price, at that time, of $24.75 per share.

89. Between August 1, 2007 – or such other earlier date by which Gansman learned the foregoing material, nonpublic information – and Murdoch's first trades in Activision securities on August 24, 2007, Gansman tipped Murdoch concerning both the existence of these highly confidential acquisition talks, and the identity of their target company, Activision. Gansman tipped Murdoch either in person, by electronic mail, or during any of the at least 140 communications between Gansman and Murdoch during this period that are reflected in telephone and text-message activity records for their direct office lines and cell phones.

90. Murdoch initiated her Activision trading by purchasing common stock on August 24, 2007. Throughout September, October and November of 2007, Murdoch continued to buy and sell Activision common stock and options contracts. Just as she had in the case of Freescale, to avoid losses on call options that would have expired before the acquisition was announced, Murdoch took advantage of small increases in their

trading prices and sold the options rather than allowing them to expire unexercised. Each time she did so, she promptly bought more Activision call options having later expiration dates, thereby remaining positioned to profit from the material, nonpublic information she had learned from Gansman when the acquisition was made public. At the time of the announcement, Murdoch owned 174 December $22.50 Activision call options contracts and 110 December $25 Activision call options contracts.

91. On Sunday, December 2, 2007, Vivendi announced that it planned to acquire a controlling stake in Activision and combine the video game publisher with Vivendi Games, forming a new entity called Activision Blizzard. The announced price at which Vivendi would acquire its controlling stake—$27.50 per Activision share—represented a 24.2% premium to Activision's closing price of $22.15 of Friday, November 30th, the last trading day before the announcement. On Monday, December 3, 2007, the first trading day following the public announcement, Activision's stock climbed to an intra-day high of $26.72 before closing at $24.97, a price that was $2.82 per share—or 12.7%—above Activision's previous trading day's close. Activision's share price continued to climb on the following day, closing at $26.74 on heavy volume.

92. On December 3rd, the day of the public announcement, Murdoch sold all of her open Activision call options contracts for a profit of $19,970.

24

## FIRST CLAIM FOR RELIEF

### Defendants Gansman, Murdoch, and Brodsky

### (Violations of Exchange Act Section 10(b) and Rule 10b-5)

93. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 92 above.

94. Defendant Gansman misappropriated material, nonpublic information about each of the seven planned acquisitions described above from E&Y and from his clients in breach of his duties to them and used that information to tip defendant Murdoch, with whom he had a friendship.

95. Defendant Murdoch knew or was reckless in not knowing that the information she received from Gansman was material, nonpublic information that Gansman misappropriated from E&Y and his clients and that it was unlawful for her to use the information for her own benefit or to benefit others.

96. Defendant Murdoch used the information she received from Gansman to purchase securities in the seven instances described above for her own benefit.

97. Defendant Murdoch, while in possession of information she knew or was reckless in not knowing was material, nonpublic information that Gansman misappropriated from E&Y and his clients, used that information to recommend ATI and Freescale securities to her supervisor and to recommend Freescale securities to her friend and potential client, each of whom subsequently purchased, or caused the purchase of, securities of ATI and/or Freescale.

98. Defendant Murdoch, while in possession of information she knew or was reckless in not knowing was material, nonpublic information that Gansman

25

misappropriated from E&Y and his clients, used that information to tip her father, defendant Brodsky, with material, nonpublic information concerning Freescale securities, and Brodsky subsequently purchased, or caused the purchase of, Freescale options through his friend and nominee.

99. Defendant Brodsky knew or was reckless in not knowing that the information he received from Murdoch and used to purchase Freescale securities was material, nonpublic information that had been delivered to her in breach of a duty of confidentiality.

100. As a result, between at least June 2006 and September 2007, Defendants Gansman and Murdoch, directly or indirectly, in connection with trades in common stock or options of ATI, Freescale, Portal Player, Spectralink, K2, Dade Behring and Activision, and Defendant Brodsky in connection with trades in options of Freescale, by use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; or (3) engaged in acts, practices or transactions which operated as a fraud or deceit upon purchasers or sellers of securities or upon other persons, in connection with the purchase or sale of securities.

101. By reason of the foregoing acts, practices, and transactions, defendants Gansman, Murdoch, and Brodsky violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF

### Defendants Gansman and Murdoch

### (Violations of Exchange Act Section 14(e) and Rule 14e-3)

102.   Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 101 above.

103.   By February 1, 2007, Polycom had taken substantial steps to commence a tender offer for the securities of Spectralink, including among other things: (1) entering into a confidentiality agreement; (2) delivering a proposal to acquire all of Spectralink's outstanding shares; (3) offering to increase its proposed acquisition price; (4) agreeing to move forward with the transaction based on Polycom's indication of an all-cash tender offer for Spectralink at a higher price; and (5) conducting due diligence.

104.   By July 9, 2007, Siemens had taken substantial steps to commence a tender offer for the securities of Dade Behring, including among other things: (1) entering into a confidentiality agreement; (2) negotiating preliminary offers between $68.00 and $70.00; and (3) exchanging information about Dade Behring's business and future growth prospects.

105.   Defendant Gansman misappropriated material, nonpublic information about Polycom's planned acquisition of Spectralink and also about Siemens planned acquisition of Dade Behring in breach of his duties to E&Y and his clients, and used that information to tip defendant Murdoch, with whom he had a friendship. Gansman's tips were the cause of Murdoch's trading in Spectralink and Dade Behring securities.

106.   At the time Murdoch purchased Spectralink and Dade Behring securities, Murdoch knew or was reckless in not knowing that the information that she learned from

Gansman was nonpublic and that it came either directly or indirectly from the offeror, the target, or any officer, director, partner or employee or any other person acting on behalf of the offeror or target.

107.    By reason of the foregoing acts, practices, and transactions, defendants Gansman and Murdoch violated Section 14(e) of the Exchange Act [15 U.S.C. §78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Grant a Final Judgment of Permanent Injunction restraining and enjoining each defendant and their agents, servants, employees, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] promulgated thereunder;

### II.

Grant a Final Judgment of Permanent Injunction restraining and enjoining Murdoch and Gansman and their agents, servants, employees, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from violating Section 14(e) of the Exchange Act [15 U.S.C. §78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

### III.

Order Gansman and Murdoch to jointly and severally disgorge Murdoch's illegal trading profits; plus prejudgment interest thereon; order Gansman, Murdoch and Brodsky to jointly and severally disgorge the illegal trading profits of Brodsky, plus prejudgment interest thereon, and order Gansman and Murdoch to jointly and severally disgorge the illegal trading profits of Murdoch's supervisor and her friend and potential client;

### IV.

Order defendants Gansman, Murdoch, and Brodsky to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**V.**

Grant such other and further relief as this Court may deem just, equitable, and

necessary.


Dated: May 29, 2008


Respectfully submitted:


Local Counsel:

Robert B. Blackburn (RB-1545)
Associate Regional Director
Securities and Exchange Commission
3 World Financial Center, Rm. 437
New York, N.Y. 10281
Telephone: (212) 336-1050
Facsimile: (212) 336-1317
BlackburnR@SEC.Gov

James A. Kidney (JK-5830)
Assistant Chief Litigation Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4010
Telephone: 202-551-4441
Facsimile: 202-772-9246
kidneyj@sec.gov


Cheryl J. Scarboro
C. Joshua Felker
J. Lee Buck, II
Kevin Muhlendorf
John C. Lehmann Jr.
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030

Attorneys for Plaintiff